RECEIVED

MAR 2 4 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **BRENDA TRAHAN** | **CIVIL ACTION NO. 11-1507** |
| **-vs-** | **JUDGE DRELL** |
| **LASALLE HOSPITAL SERVICE DISTRICT NO. 1 d/b/a HARDTNER MEDICAL CENTER** | **MAGISTRATE JUDGE KIRK** |

## RULING

Before the Court is a "Motion for Summary Judgment" filed by Defendant, LaSalle Hospital Service District No. 1 d/b/a Hardtner Medical Center ("Hardtner") (Doc. 45). All responses have been submitted, and the matter is ready for disposition. For the following reasons, the motion will be **GRANTED in PART** and **DENIED in PART.**

Significantly, this action was filed only against the hospital and not against the alleged sexual harasser, one Dr. Jeffrey Tanita. Thus, consideration is limited to the claims against the hospital.

## I.   Factual and Procedural Background

On August 18, 2011, Plaintiff, Brenda Trahan, filed a Complaint (Doc. 1) alleging she was sexually harassed by a co-worker at Hardtner Medical Center in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Specifically, Plaintiff contends that while working as a Licensed Practical Nurse ("LPN") at the hospital, she was sexually harassed by

Dr. Jeffrey Tanita, Hardtner retaliated against her after she reported the harassment, her supervisor tortiously inflicted emotional distress on her following the incident, and Hardtner negligently hired and supervised Dr. Tanita. (Complaint, Doc. 1 at 2–4). Plaintiff prays for general and exemplary damages. (Id. at 4–5). On March 23, 2012, Plaintiff submitted an Amended Complaint exhibiting the exhaustion of administrative remedies.[1] (Doc. 14).

Plaintiff is a female LPN who began her employment with Hardtner in 2007 as a part-time nurse in the medical/surgical department. (Deposition of Frances Dick, Doc. 45-5 at 56–57). As regards this case, Plaintiff was scheduled to work a twelve-hour shift from 7:00 p.m. on January 6, 2009 to 7:00 a.m. on January 7, 2009. (Deposition of Brenda Trahan, Doc. 45-6 at 59). During this shift, at approximately 3:00 a.m. on January 7, Dr. Jeffrey Tanita approached Plaintiff at the nursing station on the medical/surgical floor.  (Deposition of Brenda Trahan, Doc. 45-6 at 59–60; Statement by Barbara Maxwell, Doc. 56-2).

Dr. Tanita, a staff physician at Hardtner's clinic, also worked in the emergency department as an independent contractor through a company named EmCare. (Deposition of Paul Matthews, Doc. 45-7 at 30–33). Dr. Tanita was off-

---

[1] Before filing the complaint in federal court, Plaintiff exhausted her administrative remedies by filing a claim with the Equal Employment Opportunity Commission ("EEOC") on November 2, 2009.  On June 21, 2011, Plaintiff received a right to sue letter from the EEOC and her complaint in this Court followed soon after. On December 7, 2011, the EEOC issued a second Notice of Right to Sue, which precipitated the amended complaint. (Doc. 14).

duty the morning of the incident at issue. (Deposition of Brenda Trahan, Doc. 45-6 at 59–60; Statement by Barbara Maxwell, Doc. 56-2).

At the time, Plaintiff was entering information into a computer at the nurses' station when Dr. Tanita approached her. (Deposition of Brenda Trahan, Doc. 45-6 at 64–65). Dr. Tanita placed a can of beer on the counter near Plaintiff. When she looked up, he put his arms around her from behind. (Id. at 65–66). He then rubbed his face against Plaintiff's cheek, kissed her on the neck, and made noises. (Id. at 67–68). Dr. Tanita's touching conduct caused Plaintiff's earring to come loose and fall to the floor. (Id. at 126). Plaintiff could smell alcohol on Dr. Tanita's breath and told him to "cut it out," but Dr. Tanita did not stop. (Id. at 68–69). With his left arm still around Plaintiff's shoulder, Dr. Tanita started tickling Plaintiff's right side with his right hand and touched Plaintiff's right breast. [2] (Id. at 69–70, 107). Plaintiff freed her right arm, grabbed Dr. Tanita's right ear and twisted it. (Id. at 70). Plaintiff also struck Dr. Tanita with her right arm so that he would let go of her. (Statement by Jackie Simms, Doc. 55-1 at 1). At this point, Dr. Tanita interrupted his behavior and said, "Hey, you hurt me." (Deposition of Brenda Trahan, Doc. 45-6 at 71). Then Dr. Tanita directed his attention to other

---

[2] Defendant argues in brief Plaintiff did not specifically report to her supervisors that Dr. Tanita touched her breast during the incident. Plaintiff counters she gave the information to one supervisor orally, but she was "too embarrassed to put the fact in her written report that would be part of an official investigation." (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. 54 at 8 n. 2). At this stage in the proceedings, we assume the evidence in the light most favorable to Plaintiff. Thus, for the limited purposes of this motion, we assume Dr. Tanita did touch Plaintiff's right breast while he was tickling her.

nurses at the nurses' station, and he grabbed, tickled, and/or kissed them. (Id. at 71; Statement by Brenda Trahan, Doc. 55-2). Plaintiff says Dr. Tanita also used offensive language and sexually explicit profanity. (Statement by Brenda Trahan, Doc. 55-2).

According to Plaintiff, some nurses asked Dr. Tanita why he was at the hospital and how much he had been drinking. (Deposition of Brenda Trahan, Doc. 45-6 at 72). Plaintiff then inquired, "[Y]ou've been drinking all by yourself?" Dr. Tanita appeared to get "real mad" and said, "I knew you would be judgmental." (Id.). Soon thereafter, two nurses, not including Plaintiff, suggested the physician go outside with them, which he did. (Id. at 74).

After about ten minutes, Dr. Tanita returned to the nurses' station and acted inappropriately with other nurses. (Id. at 74–75). According to Plaintiff, Dr. Tanita massaged the shoulders of another nurse and told her how he thought she might be in bed. (Statement by Brenda Trahan, Doc. 55-2; Deposition of Brenda Trahan, Doc. 45-6 at 74–75). One of the nurses present during the incident reported Dr. Tanita "nuzzled" the necks of at least four different nurses, and "[k]issed us on the cheek and made sexually suggestive remarks and propositions." (Statement by Barbara Maxwell, Doc. 56-2). Another nurse on duty during the encounters said Dr. Tanita "straddled" her and hugged and kissed some nurses. (Statement by Joyce Thompson, Doc. 55-3; Statement by April Cotten, Doc. 55-4 at 1).

Plaintiff reports she then went to the bathroom a few yards from the nurses' station and was gone about five to seven minutes. (Deposition of Brenda Trahan, Doc. 45-6 at 75–76). Dr. Tanita left the hospital at approximately 4:00 a.m., but he would not depart until everyone hugged him. (Id. at 76–77). Plaintiff was working on another computer when Dr. Tanita said, "I'm not leaving until you hug me." (Id. at 77). Dr. Tanita hugged Plaintiff around her shoulders from behind while she sat at the computer, then he exited the hospital a few minutes later. (Id. at 77–78). In Plaintiff's words: "I didn't really hug him, he hugged me and he left." (Id. at 77). Plaintiff completed her shift and went home at 7:00 a.m. (Id. at 78).

On the afternoon of January 7, 2009, Plaintiff called Frances Dick, the Director of Nursing, to report the incident. (Id. at 80–81). April Cotten, Assistant Director of Nursing, answered the call and explained that Ms. Dick was out of town. (Id.). Plaintiff relayed what had happened, and Ms. Cotten instructed Plaintiff to "write it up." (Id. at 81). Ms. Cotten also said she would contact Ms. Dick to inform her of the situation. (Id.). After speaking with Plaintiff, Ms. Cotten called Ms. Dick immediately to discuss the complaint. (Deposition of Frances Dick, Doc. 45-5 at 78).

Ms. Dick then called the Hardtner Administrator, Paul Matthews. (Id. at 80–81). Mr. Matthews advised Ms. Dick to investigate the incident thoroughly by obtaining statements from Ms. Trahan as well as all the other staff members present and then report back to him. (Id. at 81). Ms. Dick was in New Orleans for

a work-related conference which ended January 10, so she spoke to Ms. Cotten by phone to determine when Plaintiff's next shift was scheduled. (Deposition of Frances Dick, Doc. 45-5 at 78; Affidavit of Frances Dick, Doc. 45-9 at 1–2). Plaintiff was not scheduled again until January 12, and Dr. Tanita's next scheduled emergency department shift was January 23.   Therefore, Ms. Dick decided she could properly begin her investigation on January 12, when she returned to work at the hospital. (Affidavit of Frances Dick, Doc. 45-9 at 2, 8, 13).

On the evening of January 12, Ms. Dick called Plaintiff and asked for her version of the events. (Deposition of Brenda Trahan, Doc. 45-6 at 93–95). After her shift ended, Ms. Trahan slipped a written statement under Ms. Dick's office door. (Id. at 93–96). On January 13-14, Plaintiff was again scheduled for the 7:00 p.m. to 7:00 a.m. shift in the medical/surgical department. (Id. at 97). Unknown to both Hardtner and Plaintiff, Dr. Tanita was planning to work in the emergency department during Plaintiff's shift, because of another scheduled physician's illness.  (Id.; Deposition of Frances Dick, Doc. 45-5 at 103).[3]

While Plaintiff was clocking in to start her shift, she saw Dr. Tanita in the emergency department. (Deposition of Brenda Trahan, Doc. 45-6 at 101–02). She then walked to the nurses' station to inform her husband by phone that Dr. Tanita was working and to ask what she should do. (Id. at 103).  Plaintiff's

---

[3]  We note that although the medical/surgical unit and the emergency department were located on the same floor, they were separated by some distance.

husband recommended she clock out and go home.  During this call, another nurse suggested Plaintiff use the phone in the coffee room, because Dr. Tanita was at the nurses' station listening to the conversation. (Id.). When Plaintiff turned around, she saw Dr. Tanita about three feet from her.  Thus, she went into the coffee room to finish speaking with her husband. (Id. at 104). At that point, Plaintiff informed her supervisor she was not comfortable working with Dr. Tanita at all.  Her supervisor advised she would have Dr. Tanita leave, because she needed Plaintiff to finish her shift. (Id.). Plaintiff reported Dr. Tanita and another physician were "standing in the door at the nurses[] station with their arms crossed, staring at [Plaintiff], the same way [Tanita] did when [she clocked in]." (Id. at 104–05). Plaintiff then walked to the nurses' station and was advised by her supervisor that Dr. Tanita had gone. (Id. at 105). Plaintiff completed the shift without seeing Dr. Tanita again. (Id.).[4]

On the morning of January 14, 2009, Plaintiff placed a second written statement under Ms. Dick's office door regarding Plaintiff's interaction with Dr. Tanita the previous evening. (Id. at 97). That afternoon, Ms. Dick called Plaintiff and explained Dr. Tanita had not been scheduled in the emergency department on that date and they did not know he would be there.  (Id. at 97–98). Plaintiff requested that the hospital prevent Dr. Tanita from working while she was present

---

[4] Ms. Dick eventually learned that on January 13, EmCare had asked Dr. Tanita to cover for a Dr. Braswell, who was ill. (Deposition of Frances Dick, Doc. 45-5 at 103). After Plaintiff's supervisor asked Dr. Tanita to leave, he finished some paperwork for a patient and departed after working only about one hour that day.  (Id.).

by not scheduling her on the days Dr. Tanita was set to work. (Deposition of Frances Dick, Doc. 45-5 at 101–02). Thereafter, Ms. Dick and Ms. Cotten attempted to accommodate Plaintiff's request.  (Id.; Deposition of April Cotten, Doc. 45-8 at 29).

Because the investigation was still ongoing, and as Ms. Dick was avoiding scheduling Plaintiff for shifts during Dr. Tanita's working time, Hardtner had not informed EmCare about the issues between Plaintiff and Dr. Tanita. (Id. at 103–04). Ms. Dick stated she had not anticipated EmCare's modifying the emergency room schedule for the doctors, because that was unusual, happening "maybe one time in a year." (Id.). After the incident on January 13, 2009, Ms. Dick did request EmCare provide the hospital with any changes to the emergency department schedule, because a staff member was not comfortable with Dr. Tanita. (Id. at 104). However, Ms. Dick did not tell EmCare to prohibit Dr. Tanita from working.[5] (Id. at 108).

Subsequently, there were a couple of scheduling conflicts for Plaintiff and Dr. Tanita on January 27 and January 30, 2009. On January 27, Plaintiff was informed Dr. Tanita would be covering for a Dr. Zavaletta in the emergency department, because no other doctors were available.  Ms. Dick offered Plaintiff the choice to work or stay home, and she chose to stay home. (Deposition of

---

[5] Ms. Dick stated in her deposition that she arranged her nursing schedule around EmCare's doctors' schedule: "I modified my schedule because we had a crunch for ER doctors and they were trying to make sure that we were adequately staffed. They didn't have a lot of ER doctors to pull from." (Deposition of Frances Dick, Doc. 45-5 at 104).

Brenda Trahan, Doc. 45-6 at 108–09).  On January 30, Ms. Dick called Plaintiff to let her know that since Dr. Tanita was scheduled, she could work in another department to keep her hours.  Plaintiff decided to stay home. (Id.).

The actual content of Ms. Dick's investigation included speaking with and obtaining statements from all the staff working in the hospital during the January 7 incident.  (Deposition of Frances Dick, 45-5 at 84).  Ms. Dick discovered Dr. Tanita had visited the hospital while intoxicated on a previous occasion, about a year before the January 7, 2009 event, although he did not sexually harass any nurses during the earlier visit. (Id. at 94–96; Statement of Melissa Allen, Doc. 56-4). No one had reported the incident, so hospital management officials were not aware of this prior conduct. (Deposition of Frances Dick, 45-5 at 94–96; Statement of Melissa Allen, Doc. 56-4).  Upon completion of the investigation, Ms. Dick presented her findings to Mr. Matthews, who submitted them to the hospital board. (Deposition of Frances Dick, 45-5 at 94; Deposition of Paul Matthews, Doc. 45-7 at 48–50). Dr. Tanita was informed of the allegations against him in a letter dated February 2, 2009, and he agreed to meet with the board on February 9. (Id. at 50–57, 107–08). At that meeting, the board discussed the January 7 incident with Dr. Tanita. (Id. at 50–52). In a letter dated February 10, the board informed Dr. Tanita that, as a disciplinary penalty, he would earn only half his normal compensation for four weeks and would be required to seek therapy. (Id. at 109–10).

Significant to the situation and the retaliation issue, we note that before the January 7, 2009 incident, Plaintiff had been offered a full-time LPN position but declined the post. (Deposition of Brenda Trahan, Doc. 45-6 at 111; Affidavit of Frances Dick, Doc. 45-9 at 2). In December 2008, one of Hardtner's Certified Nursing Assistants, Linetra Turner, became an LPN and was hired on a full-time basis. (Affidavit of Frances Dick, Doc. 45-9 at 2). When this occurred, Ms. Turner received customized training and supervision until she was oriented to her new role. (Id.). During this training process, part-time LPN shifts (and, therefore, Plaintiff's work shifts) were not affected. (Id.). Once Ms. Turner completed her orientation and no longer required supervision, the hours available for all part-time LPN shifts were reduced somewhat. (Id.). As part of this process, in February 2009, the number of Plaintiff's work shifts decreased. (Deposition of Brenda Trahan, Doc. 45-6 at 111). The situation was fluid, however, as Ms. Turner left her job as a full-time LPN in April 2009, and the available hours for part-time LPN shifts increased again. (Affidavit of Frances Dick, Doc. 45-9 at 2, 11–12).

Plaintiff resigned her position as a part-time LPN effective June 11, 2009. (Deposition of Brenda Trahan, Doc. 45-6 at 109–10). She now relates the reasons for her resignation to her claims. After the incident on January 7, 2009, Plaintiff alleges her co-workers laughed at her, ignored her, talked while she was trying to give reports, made "cat fight noises", and said things like, "I smell a dead rat." (Deposition of Brenda Trahan, Doc. 45-6 at 112–16; Affidavit of Brenda Trahan,

10

Doc. 56-1 at 4). Plaintiff further contends Ms. Dick, who was allegedly sarcastic to her (Deposition of Brenda Trahan, Doc. 45-6  at 143), also lowered Plaintiff's annual evaluation scores in retaliation for reporting the January 7 incident. (Affidavit of Brenda Trahan, Doc. 56-1 at 4). Plaintiff additionally claims she was cut from shifts many times, and the hospital forged write-ups for her misconduct. (Id. at 4–5). Plaintiff asserts the hospital caused her emotional distress, necessitating that she seek counseling. (Id. at 5). Plaintiff says she is no longer able to work as a nurse because of the January 7 incident.  (Deposition of Brenda Trahan, Doc. 45-6 at 134; Affidavit of Brenda Trahan, Doc. 56-1 at 5–6).

II.   **Law and Analysis**

A.   **Motion for Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider "all evidence in the light most favorable to the party resisting the motion." Seacor Holdings, Inc. v. Commonwealth Ins. Co., 635 F.3d 675, 680 (5th Cir. 2011)(internal quotations omitted). It is important to note the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

**B. Hostile Work Environment under Title VII**

Plaintiff alleges she was sexually harassed by her co-worker and forced to work in a hostile work environment in violation of Title VII. (Complaint, Doc. 1 at 2–3). To establish a claim of hostile work environment under Title VII, Plaintiff must prove:

> (1) she is a member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of [her] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action.

Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005)(additional citations omitted).

Here, it is undisputed Plaintiff is a female and a member of a protected group. We assume for the purpose of this motion that Plaintiff was the victim of unwanted sexual harassment and the harassment was based on sex, as these issues do not appear to be in contention. However, whether the harassment affected a term, condition, or privilege or her employment, and whether Hardtner knew or should have known about the harassment and failed to take prompt remedial action are matters at issue.

*1. Whether the harassment affected a term, condition or privilege of employment*

To prevail on a sexual harassment claim, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of the [plaintiff's] employment' and create an abusive working environment.'" Meritor Savings Bank,

12

FSB v. Vinson, 477 U.S. 57, 67 (1986) (additional citations omitted). The court must look at the totality of the circumstances to determine whether a work environment is "hostile" or "abusive" under Title VII. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Factors to consider include: "the frequency of the [] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The Supreme Court has instructed that the harassment must be more than "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (additional citations and internal quotations omitted). To be actionable under Title VII, the conduct at issue must be both objectively offensive, meaning that a "reasonable person would find it hostile and abusive," and subjectively offensive, meaning that the victim actually perceived it to be offensive. Harris, 510 U.S. at 21–22; see also E.E.O.C. v. Boh Bros. Const. Co., L.L.C., 731 F.3d 444, 460 at n. 15 (5th Cir. 2013).

Defendant contends Dr. Tanita's conduct was not severe or pervasive enough to alter a term or condition of Plaintiff's employment.

To bolster her position the harassment continued over more than one incident, Plaintiff relies on the following:

- on January 7, 2009, Dr. Tanita walked up to her, put his arm around her, kissed her neck, and touched her breast while he tickled her side; and

13

- on January 13, 2009 Dr. Tanita stared at her with his arms crossed, stood next to her as he eavesdropped on her phone call, and generally made her feel uncomfortable.

Plaintiff argues this conduct was severe and pervasive when viewed in the totality of the circumstances, and she references Radtke v. Everett, a case in which the Michigan Supreme Court found a constructive discharge claim should survive summary judgment based upon what Ms. Trahan calls, "remarkably similar facts to this case." (Doc. 54 at 6). In Radtke, the state court held a single incident may create a hostile work environment if it is an extremely traumatic experience like rape or violent sexual assault. 501 N.W.2d 155, 168 (Mich. 1993). Plaintiff is correct in that the case involved a "female veterinary technician, who was caressed and kissed by her supervisor during a break and who subsequently ended her employment and sought counseling." (Doc. 54 at 6). However, we find Radtke differs from the situation at hand. In that case, plaintiff's supervisor, "physically restrained [the plaintiff] by firmly placing his arm around her neck and holding her down[,]" and he "attempted to kiss her by grabbing her neck and pushing his face towards hers." Id. at 159. The Radtke court emphasized the individual was not only the plaintiff's supervisor, but also he owned the clinic and was her employer. Id. at 168–69. Thus, "because the perpetrator of the alleged conduct was the employer, recourse to the employer was fruitless. The alleged conduct, combined with the reality that the employer was the perpetrator, permits *this*

single incident to be sufficient to reach the jury." Id. at 168 (emphasis in original). In the instant case, Dr. Tanita was a co-worker as opposed to the employer, making this circumstance distinguishable from Radtke.

The Fifth Circuit has established that "because Title VII is not a general workplace civility code, the legal threshold for an abusive work environment is high." See McClinton v. Sam's East, Inc., No. 11-2156, 2012 WL 4483492 at *5 (W.D. La. 2012) (comparing Fifth Circuit cases that survive summary judgment and those that do not). Here, the totality of the circumstances shows the harassment was not severe or pervasive enough to alter a condition of Ms. Trahan's employment and meet the required burden.

As for frequency, Plaintiff relies on the January 13 conduct to support her position the harassment was pervasive, rather than an isolated incident.  It is clear Dr. Tanita's conduct on January 7 (hugging Ms. Trahan, kissing her neck, tickling her, and touching her breast) was unwanted and inappropriate.  Plaintiff says the second incident on January 13 is part of the same.  She adds Dr. Tanita made her uncomfortable by glaring at her, standing near the nurses' station with his arms crossed, and eavesdropping on her phone conversation. Although Plaintiff argues the January 13 conduct shows the January 7 event was not an isolated incident, we conclude these two episodes on separate days do not establish pervasive harassment as a matter of law. While the actions may have

made Plaintiff feel uncomfortable, we do not find Dr. Tanita's conduct on January 13 to be objectively and clearly sexual harassment.

Turning to severity, the Fifth Circuit has consistently found that the touching of intimate body parts is not severe enough to alter the material terms or conditions of employment if it is not done continually or habitually. For example, the appellate court has found an employee's conduct did not amount to harassment that alters the terms or conditions of employment under Title VII for purposes of summary judgment where the employee touched plaintiff's breasts, stared at plaintiff in an intimidating manner, placed arms around plaintiff's waist, and rubbed plaintiff's buttocks. Paul v. Northrop Grumman Ship Sys., 309 Fed. Appx. 825 (5th Cir. 2009)(holding "the type of non-consensual physical touching alleged by [plaintiff] was held to be actionable under Title VII only in cases where it is chronic and frequent"). See also Gibson v. Potter, 264 Fed. Appx. 397, 400 (5th Cir. 2008); Hockman v. Westward Communications, LLC, 407 F.3d 317, 328 (5th Cir. 2004); and Derouen v. Carquest Auto Parts, Inc., 275 F.3d 42 (5th Cir. 2001). Similarly, in the instant case, Dr. Tanita's conduct is limited to hugging Plaintiff, kissing her neck, touching her breast while tickling her, and later staring at plaintiff in an intimidating manner. Therefore, the Court finds Dr. Tanita's behavior is not sufficiently severe to constitute the alteration of a term or condition of employment.

Because Plaintiff has failed to demonstrate she was subject to either severe or pervasive harassment under the totality of the circumstances, we conclude Plaintiff's terms or conditions of employment were not altered by the otherwise opprobrious conduct of Dr. Tanita.

## 2. Whether Hardtner Medical Center failed to take prompt remedial action

Turning to the last prong of the Title VII hostile work environment test, we analyze whether Defendant engaged in "prompt remedial action" to protect Plaintiff when the alleged harassment occurred. See Hockman, 407 F.3d at 329. To determine whether an employer took such prompt remedial action, the court must examine the "particular facts of the case–the severity and persistence of the harassment, and effectiveness of any initial remedial steps." Williams-Boldware v. Denton County, Tex., 741 F.3d 635, 641 (5th Cir. 2014) (citing Hirras v. Nat'l R.R. Passenger Corp., 95 F.3d 396, 399–400 (5th Cir. 1996)). An employer's response should be "'reasonably calculated' to halt the harassment." Skidmore v. Precision Printing and Pkg., Inc., 188 F.3d 606, 615–16 (5th Cir. 1999) (citing Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989)).

The Fifth Circuit has held in multiple cases that "an employer's response to discriminatory conduct constituted prompt remedial action as a matter of law." Hirras, 95 F.3d at 400 (citing Waymire v. Harris County, 86 F.3d 424, 428 (5th Cir. 1996)). See also Carmon v. Lubrizol Corp., 17 F.3d 791, 794–95 (5th Cir. 1994); Nash v. Electrospace Sys., Inc., 9 F.3d 401, 404 (5th Cir. 1993); and

Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309–10 (5th Cir. 1987). In

Carmon, the appellate court found an employer engaged in prompt remedial

action, because "[i]t took the allegations seriously, it conducted prompt and

thorough investigations, and it immediately implemented remedial and

disciplinary measures based on the results of such investigations." 17 F.3d at

795.

Plaintiff suggests here that Defendant has conceded it failed to take prompt

remedial action. (Plaintiff's Opposition to Defendant's Motion for Summary

Judgment, Doc. 54 at 4–5). On the other hand, Defendant contends it did take

effective prompt remedial measures, and Plaintiff did not complain again of similar

behavior. (Defendant's Memorandum in Support of its Motion for Summary

Judgment, Doc. 45-2 at 12).

As detailed above, the record reveals Plaintiff promptly reported the alleged

sexual harassment to hospital management on January 7, 2009. Although the

Assistant Director of Nursing received the complaint, because the Director of

Nursing, Ms. Dick, was out of town on business, Ms. Dick, who was instructed by

the hospital Administrator to be thorough, began investigating the incident as

soon as she returned.  Ms. Dick spoke to and received written statements from

every employee who was present at the time of the January 7 incident. During the

investigation, hospital management first learned Dr. Tanita had visited the

hospital while intoxicated once in the past, though the event did not involve any

sexual misconduct and was not reported to any members of the management team. Accordingly, management had no prior notice or knowledge of that occurrence. Ms. Dick completed her investigation and promptly relayed her report to Mr. Matthews. Dr. Tanita was informed of Plaintiff's allegations and was asked to attend a February 9, 2009 meeting with the hospital board.  On February 10, the board sent Dr. Tanita a letter providing the following sanctions as reprimand for his conduct involving Plaintiff: (1) Dr. Tanita's normal compensation was reduced for four weeks; and (2) he was required to seek therapy.

Also, as we have previously addressed, the record shows Defendant accommodated Plaintiff's request not to work with Dr. Tanita, by avoiding scheduling Plaintiff for the same shifts as Dr. Tanita. However, since the schedules of the emergency department physicians were set by the subcontractor, EmCare, Defendant did not know Dr. Tanita would be covering for another doctor on January 13, 2009. According to Ms. Dick, the situation was most uncommon. There is no evidence Defendant was aware of this change before it occurred. However, upon finding out, and in an effort to prevent any further conflicts, it did request that EmCare notify the hospital of any future personnel changes involving Dr. Tanita.

While a month to complete an investigation may be argued as not prompt, under these facts it was reasonable considering the following: (1) the Director of Nursing was out of town when the complaint was received; (2) several employees

who needed to be interviewed worked nights or other irregular hours; (3) Plaintiff came in on a part-time basis only for a handful of days per month; and (4) she was given the option to work in another department if necessary to avoid Dr. Tanita while the investigation was ongoing.  Furthermore, the administration took the complaint seriously, ultimately conducted a thorough investigation, and disciplined Dr. Tanita for his misconduct.

Additionally, the remedial actions taken by Defendant appeared to be effective. Plaintiff did not make any other complaints about sexual harassment after Dr. Tanita was disciplined by the board, and the record shows there were no further incidents between Plaintiff and Dr. Tanita.[6]

Therefore, the Court finds Defendant's investigation was thorough.  Once completed, it was immediately acted upon by the hospital board and it effectively halted the conduct. Since Plaintiff has failed to raise a genuine dispute of material fact to support her claim of a hostile work environment, Defendant's Motion for Summary Judgment on this claim will be **GRANTED.**

## C. Retaliation/Constructive Discharge under Title VII

Plaintiff alleges Defendant retaliated against her after she reported the harassment, and she claims she was constructively discharged.  In order to establish a prima facie case of retaliation, Plaintiff must show: "(1) she engaged

---

[6] Apparently, Dr. Tanita was eventually fired for more egregious sexual harassment conduct with other members of the nursing staff. However, that incident did not concern Plaintiff and is outside the realm of this suit, since it occurred a number of months after Plaintiff resigned.

in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action." Turner v. Baylor Richardson Medical Center, 476 F.3d 337, 348 (5th Cir. 2007). "After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action." Black v. Pan American Laboratories, L.L.C., 646 F.3d 254, 259 (5th Cir. 2011). Once the employer states its legitimate, nonretaliatory reason, "the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive." Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450, 454 (5th Cir. 2013) (internal citations omitted); see also University of Texas Southwest Medical Center v. Nassar, __ U.S. ___, 133 S. Ct. 2517, 2533 (2013).

A constructive discharge occurs when an employee resigns because "the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Keelan v. Majesco Software, Inc., 407 F.3d 332, 342 (5th Cir. 2005). To make this determination, the Court engages in a fact-intensive analysis of the following factors singly or in combination:

> (1) Demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger or less experienced/qualified supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the

21

employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Id. (additional citations omitted). "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div., 512 F.3d 157, 167 (5th Cir. 2007) (quoting Brown v. Kinney Shoe, 237 F.3d 556, 566 (5th Cir. 2001)). The Court applies an objective "reasonable employee" test: "whether a reasonable person in the plaintiff's shoes would have felt compelled to resign." McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007). Generally, the employee who resigned bears the burden to prove constructive discharge. Haley v. Alliance Compressor LLC, 391 F.3d 644, 650 (5th Cir. 2004).

In the case at bar, Plaintiff engaged in protected activity within the meaning of Title VII when she filed a complaint regarding sexual harassment with her supervisor and the Director of Nursing. Defendant does not appear to dispute this. (See Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. 45-2 at 13–15). At issue is whether Plaintiff suffered an adverse employment action and whether there is a causal link between the protected activity and the adverse employment action.

Plaintiff contends she suffered an adverse employment action because her employer lowered her annual evaluation score, cut her hours, unjustifiably wrote her up for disciplinary conduct, refused to remove Dr. Tanita from the night shift of the emergency department, and falsified reports alleging she sexually harassed

22

another co-worker. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. 54 at 10–11). Plaintiff also alleges her co-workers harassed her by ignoring her, laughing at her, talking while she tried to give report, being sarcastic, making cat noises, and making comments including "I smell a dead rat."

As for Plaintiff's co-workers, Defendant counters it never had an opportunity to remedy the alleged rude behavior because Plaintiff never reported it. (Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. 45-2 at 14; see also Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. 54 at 10–11). Defendant also asserts that rude behavior of co-workers cannot support a constructive discharge claim. (Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. 45-2 at 14)(citing Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 440 (5th Cir. 2005); Ranel v. Gilley Enterprises-Louisiana Partnership, No. 08-0149, 2009 WL 1310879 at *5 (W.D. La. 2009)). In Harvill, the Fifth Circuit found the plaintiff had not suffered an adverse employment action where,

> she was treated rudely and with general hatefulness by other supervisors and employees; . . . a man she did not know began taking pictures of her; . . . a meritless racial harassment charge was brought against her; and . . . she heard a new supervisor state that he would receive a bonus if he ran her off.

Id., 433 F.3d at 440 (internal quotations omitted). The Harvill conduct is similar to that here.  We find Plaintiff's complaints of her supervisor's sarcasm and her

co-workers rudeness, as detailed above, without action supporting or approval by the employer, do not rise to the level of an adverse employment action that supports a constructive discharge claim or would compel a reasonable person to resign.

Cutting work hours after a sexual harassment complaint is reported can, however, sometimes be seen as an adverse employment action. Defendant answers this contention with a legitimate, nonretaliatory reason for the reduction in her hours. (See Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. 45-2 at 14–15). As discussed above, before the incident on January 7, 2009, Plaintiff had been offered and had declined a full-time LPN position at Hardtner.  Still wanting a full-time LPN, Defendant hired Linetra Turner for the position when she became eligible. Ms. Turner required supervision during her training and orientation, so her promotion did not then affect part-time LPN hours for anyone. However, in February 2009 when Ms. Turner completed orientation and started working full-time without supervision, the hours available for all part-time LPN employees, including Plaintiff, decreased. When Ms. Turner resigned from her position as a full-time LPN in April 2009, the available hours for part-time LPN shifts increased. At this time, however, *Plaintiff* requested to have fewer hours. The Court finds this is a legitimate, nonretaliatory explanation for the fluctuation in Plaintiff's work hours.  Additionally, the Court notes that Plaintiff declined to work in the medical/surgical department and also the psychiatric

department on night shifts when Dr. Tanita would be working in the emergency department.  This caused a further reduction in her hours.

As is usual in such cases, however, Plaintiff argues Defendant's explanation is merely a pretext for retaliation, and her hours would not have been cut but-for the employer's retaliatory motive. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. 54 at 11). Plaintiff's work schedules from August 20, 2008 to May 26, 2009[7] show the hospital regularly cut her shifts, as well as her co-workers' shifts, both before and after the January 7, 2009 complaint. (Affidavit of Frances Dick, Doc. 45-9 at 3–12). Thus, we are not convinced Defendant reduced Plaintiff's hours because of her report on an incident of alleged sexual harassment.

As for Plaintiff's contention that Dr. Tanita should not have been allowed to continue working in the emergency department, it is unclear whether the hospital had the authority to order EmCare to vary Dr. Tanita's schedule.  The information in the record establishes EmCare, not Hardtner, staffed the doctors for the emergency department. The Court is mindful it may not have been possible immediately to prohibit Dr. Tanita from working, because this rural medical center has a limited number of doctors and, for public policy reasons, hospitals must have doctors working in emergency rooms twenty-four hours a day. In any event, this is a nonretaliatory, legitimate reason why Dr. Tanita continued to work in the

_____

[7] The record does not contain copies of Plaintiff's work schedules beyond this date.

25

emergency department. Plaintiff has not suggested this was pretext and that Dr. Tanita would not have worked as he did but-for the hospital's retaliatory motive.

Plaintiff also contends her employer lowered her annual evaluation score, unjustifiably wrote her up for disciplinary conduct, and falsified reports alleging she sexually harassed another co-worker. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. 54 at 10–11). The record shows Plaintiff did receive lower scores on her annual evaluation after she made her complaint. (Personnel File Data of Brenda Trahan, Doc. 56-5 at 1–7). Additionally, she was written up for allegedly violating the confidentiality agreement she signed when she was hired and stealing hospital property by making a photocopy of a written hospital policy and taking it home. (Id. at 8). Further, there is a statement in Plaintiff's personnel file from D'Marco Mays that alleges Plaintiff sexually harassed him by touching him without permission and admiring his large muscles. (Defendant's Motion for Summary Judgment Exhibit 2, Doc. 45-6 at 159). Plaintiff claims Defendant falsified the statement and counters that D'Marco Mays provided an affidavit attesting he had never seen the statement before, had not written or signed the statement, and had never been harassed or made to feel uncomfortable by Ms. Trahan. (Affidavit of D'Marco Mays, Doc. 56-7). Defendant has failed to respond to Plaintiff's contentions in this regard, and looking at this evidence in the light most favorable to Plaintiff, these actions may have been in retaliation for Plaintiff's complaint. Therefore, these remain genuine disputes of

material fact, and Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim must be **DENIED.**

## D. Tortious Infliction of Emotional Distress

Plaintiff argues Defendant also intentionally inflicted emotional distress on her in violation of Louisiana state law. To prevail on this claim, Plaintiff must demonstrate:

> (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from [its] conduct.

McCoy v. City of Shreveport, 492 F.3d 551, 563 (5th Cir. 2007) (quoting White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991)).

The Court is mindful that "Louisiana courts, like courts in other states, have set a very high threshold on conduct sufficient to sustain an emotional distress claim, and the Louisiana Supreme Court has noted that 'courts require truly outrageous conduct before allowing a claim . . . even to be presented to a jury.'" Morris v. Dillard Dep't Stores, 277 F.3d 743, 756–57 (5th Cir. 2001) (citing Nicholas v. Allstate Ins. Co., 765 So. 2d 1017, 1024–25 (La. 2000) (additional citations omitted). As Justice Knoll, writing for the majority in Nicholas explained:

> "It has not been enough that the defendant has acted with an intent which is [tortious] or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so

27

> extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim, "Outrageous!"

765 So.2d at 1022.

Plaintiff contends Defendant committed outrageous conduct when it permitted Dr. Tanita to continue working in the emergency department and unreasonably altered Plaintiff's schedule. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. 54 at 12–13). Defendant, however, claims it had no knowledge Dr. Tanita would be covering another physician's shift on January 13, 2009. (Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. 45-2 at 16).

Plaintiff has not established that Defendant's conduct was outrageous and extreme, or that it intended to inflict serious emotional distress or knew such distress was substantially certain to occur. Plaintiff has not provided any countervailing evidence that Defendant knew Dr. Tanita would be working on January 13, 2009, or that it was complicit in intentionally changing Plaintiff's schedule with the motive of causing her emotional distress. As for the incident on January 13, 2009, as noted above, the evidence shows the emergency department's physicians were scheduled by EmCare, not Hardtner. Plaintiff did ask not to work on the same nights as Dr. Tanita, and the record reflects the

hospital accommodated this request by giving her the option of not working or working in a different department. Plaintiff chose not to work.

Plaintiff has failed to meet the high threshold for tortious infliction of emotional distress and has not proven Defendant's conduct was so outrageous or extreme that it is intolerable in a civilized society. While there is some evidence that Plaintiff was emotionally distressed and sought counseling, she has not demonstrated Defendant desired intentionally to inflict emotional distress on her. Thus, proof of the two required elements fails, and Defendant's Motion for Summary Judgment regarding the tortious infliction of emotional distress claim will be **GRANTED**.

### E. Negligent **Hiring and Negligent Supervision**

Plaintiff lastly claims Defendant was negligent in the hiring, supervision, and retention of Dr. Tanita. (Complaint, Doc. 1 at 3). Specifically, she alleges Defendant had knowledge about "Dr. Tanita's prior acts of harassment and intoxication at the hospital and at the home of hospital employees and took no steps to protect Plaintiff or its employee [*sic*] from Dr. Tanita. In other words, Defendant . . . has known of Dr. Tanita's . . . sexual abuse of nurses prior to the incidents at issue here and took no actions against Dr. Tanita." (Id. at 3–4).

Defendant contends Plaintiff's claim is barred by Louisiana Worker's Compensation law. (Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. 45-2 at 18) (citing La. R.S. 23:1032; Wakefield v. Kyle,

12 So. 3d 468 (La. App. 2d Cir. 2009)). Louisiana Revised Statute Title 23 Section 1032 titled "Exclusiveness of rights and remedies; employer's liability to prosecution under other laws" states that with the exception of intentional acts described therein, worker's compensation provides the exclusive rights and remedies for employer-employee liability.   The court in <u>Wakefield</u> held the dismissal of a negligent hiring claim was proper, because the Office of Worker's Compensation has exclusive adjudication of negligence claims against an employer. 12 So. 3d at 473; <u>see also</u> <u>Reeves v. Structural Preservation Systems</u>, 731 So. 2d 208, 212 (La. 1999).

Applying this analysis to the instant case, Defendant's Motion for Summary Judgment regarding negligent hiring and supervision will be **GRANTED**.

III.  <u>Conclusion</u>

For the reasons explained above, Defendant's Motion for Summary Judgment (Doc. 45) will be **GRANTED IN PART**, such that Plaintiff's claims of hostile work environment, tortious infliction of emotional distress, and negligent hiring and supervision will be **DISMISSED WITH PREJUDICE**.   The motion will be **DENIED IN PART** as to Plaintiff's claims for retaliation, which will proceed to trial.

SIGNED on this 24 day of March, 2014 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT